Argued April 20; modified November 23, 1943

# DRAKE ET AL. *v.* CITY OF PORTLAND ET AL.
## (143 P. (2d) 213)

Before Bailey, Chief Justice, and Rossman, Kelly, Lusk, Brand and Hay, Associate Justices.

L. E. Latourette and John B. Seabrook, both of Portland, for appellants.

H. M. Tomlinson, of Portland, for respondents.

ROSSMAN, J.

This is an appeal by all except seven of the defendants from a decree of the circuit court which was entered after all parties had filed their pleadings and after the close of the evidence. The attacked decree (a) overruled a demurrer filed by the appealing defendants to the second amended complaint, and (b) awarded the plaintiffs the relief sought by the pleading just mentioned. That relief consists of:

"* * * the reclassification by the Civil Service Board of the City of Portland, Oregon, adopted by said Board October 6, 1938, in so far as the same applies to or affects the plaintiffs and the seven employe-defendants and the positions occupied by them in the Bureau of Water Works of the City of Portland, is null and void."

The plaintiffs, twenty-six in number, hold clerical positions in Portland's Bureau of Water Works, Revenue Division. The defendants, after the amended complaint was filed, fell into four categories: (1) the city of Portland; (2) the city's five commissioners, who constitute its council, one of them being also its mayor; (3) the three commissioners who compose the city's Civil Service Board; and (4) seven employees of the defendant municipality who, like the plaintiffs, hold clerical positions in the city's Bureau of Water Works, Revenue Division.

The appellants are the defendant municipality, the Civil Service Board and the five officials who are the commissioners of the city.

The ruling upon the demurrer to the second amended complaint was postponed, according to the decree, because of a stipulation "that the trial upon the issues of fact should proceed, and the decision on the demurrer should abide the introduction of the evidence, the final arguments and submission of the case." In our determination of the cause, we will ignore the demurrer.

It is seen from the language above quoted that the circuit court termed the Civil Service Board's order of October 26, 1938, a "reclassification." The plaintiffs also denominate the order a "reclassification." The appellants insist that it is a "classification." As Mr. Justice Holmes said, "Definition is the most difficult of all things, both in the law and elsewhere." We believe that this is another of the numerous cases in which nothing of importance turns upon nomenclature. Until we reach a subsequent paragraph of this opinion, we shall use the words "classification" and "reclassification" interchangeably.

The subject-matter attacked by this suit is the order made by the Civil Service Board October 26, 1938. The second amended complaint, to which we may refer as the complaint, seeks an adjudication holding that order void and "defining the lawful rights, status and classification" of the plaintiffs. This suit was instituted under our Uniform Declaratory Judgments statute, §§ 6-601–6-616, O. C. L. A.

The purpose and basis of this suit are stated thus in the plaintiffs' brief:

"This suit was instituted to nullify a re-classification made by the defendant Civil Service Board on October 26, 1938, on the ground that said Board had no charter power to make the re-classification; that in making it the Board usurped certain powers granted by the charter exclusively to the Council and to the Commissioner in charge of the particular department; * * *"

The plaintiffs concede that the challenged classification order dismissed no one from the city's employ. Salaries of all the city's employees remained the same after the entry of the order as before. All of the city's employees continued to perform the same work after the classification as they were performing when it was adopted. The plaintiffs contend, however, that the order injured or prejudiced them in these particulars: (1) They can no longer be transferred, so they say, from position to position in the Bureau of Water Works, Revenue Division, to the same extent as before the entry of the order; (2) their seniority rights were impaired by the order; (3) some of the thirty-three employee parties to this suit were, in effect, promoted and the others were, in effect, demoted by the order; (4) some of the plaintiffs are performing work which

is inferior in kind to that which is performed by some of the other thirty-three employee parties to this suit; and (5) before those who were disfavored by the order (to adopt the plaintiffs' phraseology) can be entitled to perform the better kind of work, they must take a promotional examination.

The classification made by the attacked order does not affect merely the clerical positions, but applies to all positions subject to classified civil service, with the exception of some in the Fire and Police Bureaus. There are about 2400 employees in the city's classified civil service. The work performed by the clerks in the Bureau of Water Works, Revenue Division, was segregated by the attacked order into three divisions: Senior Account Clerk, Account Clerk and Junior Clerk.

The plaintiffs claim that the Board's order was a reclassification of the employees and not, as the appellants contend, a classification of positions or jobs. They also contend that the order, in dividing the existing clerical work into three divisions, created jobs in violation of the charter provision which confers upon the council—not the Board—the power to create jobs and designate their duties. The plaintiffs call attention to a provision of the charter which empowers the city's commissioners, and not the Board, to hire and dismiss employees. The plaintiffs argue that the 1938 order was a reclassification, not a classification, and urge that the Board has no power to reclassify. The plaintiffs claim that all of the employees in the revenue division were adversely affected by the order. After calling attention to the fact that prior to the 1938 order the employees in the revenue division were transferred from time to time to different positions, thus gaining relief from the monotony of the work, they contend that

the challenged order prohibits transfers. They insist that the employees whose work was classified by the 1938 order as senior account clerk were by that very fact promoted without examination, and that the others were demoted in the same way. In pursuing their contention that the account clerks and junior clerks were demoted, the plaintiffs argue that the employees within those two classifications could not, after the entry of the attacked order, be advanced to the position of senior account clerk unless they (1) passed a promotional examination, and (2) were appointed senior account clerk by the commissioner in charge of the water bureau. Next, they argue that the 1938 order denies all clerks in the Revenue Division the seniority to which they would otherwise be entitled.

The appellants claim that (1) the Board acted within the scope of the authority conferred upon it by the city's charter when it made the attacked order; (2) the order in no wise trespasses upon any rights which the charter grants to the council or to the city's commissioners; (3) the order is a classification of jobs and positions, and not of employees; (4) the order does not prejudice anyone who was in the city's employ at the time of its entry; and (5) the attacked order affected those who were in the city's employ October 26, 1938, only to the extent of changing the names of the positions they held. According to the defendants, the purpose of the order, apart from changing the names of positions, was limited to future civil service examinations and the recruitment in the future of civil service employees for the city.

■ The defendants accompany this contention, that the attacked classification affected the plaintiffs only to

the extent of changing the titles of the positions which they hold, with recourse to the rule that only those adversely affected by a statute or ordinance are entitled to challenge its validity. Seemingly, the plaintiffs could have taken the defendants at their word, that the attacked classification had no application to them, and dismissed their suit, but they did not do so. Their complaint avers that the challenged order is applicable to them and to their jobs. They insist that the classification injures and prejudices them. In view of that situation, we believe that this suit does not submit a cause which is purely academic, but one which entitles the plaintiffs to a judicial construction of the attacked classification: Borchard, Declaratory Judgments, 2d ed., p. 966.

In 1903 the defendant city inaugurated classified civil service. Shortly the civil service commission made a classification. In 1905 there was a reclassification. In 1913 there came a comprehensive reclassification of all the positions of employment in the city service subject to civil service rules. The reclassification segregated all of the positions into classes, and the latter into ranks. The classes and ranks were denoted by letters. Thus, the letter C, when used to denote a class, meant clerical service; E meant engineering service; L, labor service; and so forth. Class C, Rank C, meant clerical service of Rank C grade.

When this suit was instituted, the plaintiffs were only six in number. All of them were clerks in the city's Bureau of Water Works, Revenue Division, and had entered the city's employ prior to 1913. The positions they held were classified in the 1913 reclassification as Class C, Rank C. The order of October 26, 1938, en-

tered by the present Board classified the work performed by them as Junior Clerk.

When the plaintiffs were only six in number, an answer was filed to their complaint, and a demurrer was then presented to the answer. As a result of the ruling upon the demurrer, an amended complaint was filed which made as parties to this suit all of the clerical employees in the city's Bureau of Water Works, Revenue Division—thirty-three in number. Twenty-seven of them were performing work, on October 26, 1938, which had been classified by the 1913 reclassification as Class C, Rank D. Those twenty-seven entered the city's employ after 1913. The other six we have already described. All parties concede that the clerical work designated as Ranks C and D by the 1913 order was virtually the same. The six employees (plaintiffs) of Rank C grade, and the twenty-seven of Rank D, were treated alike and no distinction was made in the kind of work assigned to them. The Board never held an examination for Clerk, Rank C, and long before October of 1938 that rank fell into disuse.

The order of October 26, 1938, that is, the one which the attacked decree held to be void, abandoned the use of the letter classifications and designated the various positions by names, such as Account Clerk, Junior Engineer, and so forth. It divided the clerical work, which was then designated as Class C, Ranks C and D, into three divisions: Senior Account Clerk, Account Clerk and Junior Clerk. Junior Clerk was changed to the simple designation Clerk February 8, 1939. Of the thirty-three clerks who were made parties by the amended complaint, four were performing work, October 26, 1938, which was classified by the order entered on that day as Senior Account Clerk; thirteen were

performing duties which became entitled Account Clerk, and sixteen were performing duties which the attacked order classified as Junior Clerk. The salaries of these thirty-three clerks ranged from $115 to $200 or more per month, and the work of the various groups into which they fell varied greatly. For instance, one was assistant to the chief clerk; some were timekeepers; some were cashiers; some were information clerks; some were telephone operators; and some were ledger clerks; some performed work of a supervisory type—others did not.

Of the thirty-three clerks, twenty-six, as we have already said, became plaintiffs and seven were made defendants. The latter filed an answer, stating that they

"still prefer that the case be submitted without counting them either for or against the plaintiffs, but if the court deems it necessary that they be counted one way or the other, then these defendants adopt the answer of the City * * *."

Two of the seven just mentioned were performing work which the attacked order classified as Senior Account Clerk, and the work of the other five was that of Account Clerk.

In 1913 the city adopted the charter under which it now administers its affairs. The new charter substituted for the councilmanic form of government then employed the present commission form of municipal organization. Under the 1913 charter the affairs of the city, except its classified civil service, are administered by five commissioners, one of whom is mayor. The general functions of the city's government are divided by the charter into five departments. The mayor

is directed to assign one commissioner to head each of the departments, and the one thus assigned has power to employ and discharge the department's personnel subject to the rules which govern classified civil service. The commissioner in charge of a department is its manager or supervisor. The five commissioners constitute the council, and while acting as such exercise the general legislative powers of the city, except those granted to the Civil Service Board. It is the council, and it alone, which can create or abolish offices, places and employments. Likewise, it is the council which has the power to fix salaries and prescribe the duties of any position which it creates.

Prior to 1913 the municipality acquired the utility which supplies the city with water. After its purchase, and until 1913, the water works was administered by a board. The 1913 charter abolished the board and the water works is now a bureau of the Department of Public Utilities. Within that bureau was created the revenue division with whose employees we are concerned.

The 1913 charter retained the existing civil service commission but changed its name to Civil Service Board. For present purposes it suffices to state that the charter empowers the Board to (1) classify the jobs and positions in the city service subject to classified civil service; (2) conduct civil service examinations for the ultimate purpose of recruiting future employees; (3) certify to the heads of departments, when vacancies occur, eligible lists of applicants; (4) write whatever rules may be required to carry into effect the purpose of the charter provisions which create classified civil service; and (5) conduct whatever investiga-

tions may be necessary to inform the Board whether or not the provisions concerning classified civil service are being observed.

Thus, it is seen that two independent charter-created commissions, each operating in a separate field, administer the affairs of the city. One of them is confined to the operation of the municipality's classified civil service, and to the other is assigned all of the other affairs of the city. Each possesses both administrative and legislative powers. The power of each stems from the same source—the charter. Neither is superior to the other.

We shall now state the facts disclosed by the transcript of evidence. It covers five hundred typewritten pages. In addition, there are seventy-nine exhibits, all of which are either typewritten or printed documents. One of them alone consists of one hundred and twenty-two single-spaced typewritten pages. We shall mention only such facts revealed by the record as we deem pertinent to the validity of the attacked order and the issue as to whether or not it affects the plaintiffs.

In 1934 the city amended its charter (1913 charter) by striking from § 102 the part which read:

"No examiner shall receive any compensation for his services as such."

After that section was repealed, the Board, August 1, 1937, hired Mr. R. W. Reynolds to serve as a paid examiner. Before the employment of Mr. Reynolds, the Board had become convinced that the 1913 classification was obsolete and that satisfactory examinations could not be conducted unless the Board had a better conception of the work for which examinations were from time to time conducted. Mr. Oscar Furuset, an

able member of the bar who has been chairman of the Board since 1935, testified:

"It was perfectly obvious to the members of the Board, as well as our staff, and also the city administrators, that changes had occurred in work being performed by employees."

Mr. W. E. Marion, secretary of the Civil Service Board, testified:

"We found back in the twenties that teamsters were carried as such on the payrolls and there were no teams in use in the Street Cleaning Bureau. Those men were valuable men to the Street Cleaning Bureau; they were familiar with all of the details of the work and it was either that they lose their jobs or that * * *. We found the same situation true in the Fire Department when steam fire engines went out of existence. There was a classification of duties there that was called Assistant Engineer and Stoker. Those men, with the abandonment of the steam fire engines, were no longer needed in that capacity, but they were valuable men * * *. We found after a short while with our experience in the Street Cleaning Bureau again that hostlers there, for instance, men who, I presume,—it was before my time,—were handling teams when they were in the barn,—those men were handling, servicing, trucks. They no longer had teams to handle or service. We found that there were always conflicting opinions as to what the duties were of certain positions in the Engineering Department, Public Works, * * *. We found in the Bureau of Garbage Refuse Disposal, men classified ordinarily as day laborers who were actually doing all the work of firing, superintending the work or performing the work in connection with the burning of incineration, and who had been entirely eliminated from labor work on the dumps and in other capacities around the plant for which they originally took examinations. Those men who are

in the positions of firemen out there were restive; they felt that their work was to some extent more arduous, possibly more dangerous, and that they should be classed separately because they were no longer doing the work for which they had taken the original examination. We found in the Police Department that men who had taken the examination for patrolmen were assigned to and were performing and had been performing the work of auto mechanics in the police garage and were no longer patrolling beats. We found, in addition to that, two men in the garages of the Police Department who were in charge, actually superintendents, and whose original examination was that of patrolman * * * ."

Witnesses testified that the work performed by the city's clerks had likewise undergone changes since the 1913 classification. The transition in office practices from manual to machine operations had altered the type of clerical work performed in the revenue division, and the increase in the city's population was reflected in expansions in the clerical staff, which in turn brought about segregations or specializations in the work performed by the clerks.

On account of the situation above reviewed, the Board was satisfied that the 1913 classification was outmoded and that a new one was needed. Accordingly, it directed Mr. Reynolds to make a new classification of the positions in the classified civil service. The Board's purpose was indicated by Mr. Furuset in his following testimony:

"* * * one of the purposes was to have an analysis of each position in the classified civil service so that in conducting examinations the Civil Service Board and its staff would know what kind of work was being performed so that it could frame intelligent questions and have an intelligent exam-

ination which would secure the best qualified people to enter the civil service.''

In an effort to ascertain the duties which each employee was performing day by day, Mr. Reynolds compiled a questionnaire and delivered a copy of it to every city employee. One of its sentences was: 

"13. This is the most important item on this Questionnaire. Fill out very carefully. Describe your job in as much detail as　*　*　*.''

Instructions which accompanied the questionnaire read in part: 

"Item 13. Description of Duties.　*　*　* Think of the work you do in the course of a day, a week, a month, and a year. Describe first　*　*　*.''

Other requirements were that the superiors approve or disapprove the descriptions of the work and append additional descriptive material. Matters were so arranged that the heads of all departments afforded the employees opportunity to answer the questionnaire during working hours; in other words, supplying the required information was deemed a part of the employee's duty to the city. As a part of the analysis, the staff of the Board consulted with many of the employees, with most of their superiors and with all of the commissioners in further efforts to ascertain precisely the work performed by each of the city's employees. Mr. Reynolds made personal examinations of the work performed by some of the employees by visiting them on the job.

After all of this information was obtained, Reynolds prepared what he termed a "job analysis." The latter consisted of a classification of the various kinds of work which the employees were performing; or, to use his own words, he "pigeonholed all positions having duties and responsibilities so similar that those po-

sitions could be treated alike for the purpose of examinations, that is recruitments, original entrance into the service and promotions through examination." Last of all, he made a report to the Board. The latter, after some amendments had been made to it and it had been adopted by the Board, became the classification order now under attack. However, before the Board took its action of October 26, 1938, it submitted Reynolds' report to the employees and the city officials. Everyone interested was afforded sixty days' time in which to submit data or objections. Some of the employees, including some of the plaintiffs, availed themselves of the opportunity. Before Reynolds' report was adopted October 26, 1938, as the Board's classification order, the Board held a hearing for the purpose of affording the employees an opportunity to come before it and make known their views. It was not until all of this had been done that the Board, on October 26, 1938, adopted Reynolds' report as the Board's classification order. The vote of the Board was unanimous.

After the Board had taken its action, it submitted the classification order to the city council which ordered it filed. Thereafter in writing budget ordinances the council made use of the new titles created by the classification order.

Mr. Reynolds' uncontested testimony was:

"Our basis of classification was the duties and responsibilities of the position."

He added:

"The classification was made of the positions on the basis of duties and responsibilties as they appeared to us after having the employee describe his work, after discussions with supervisors, after actual observations in the field in many cases, and in many cases after actual discussion with the employee performing those duties."

. It will be observed that Reynolds testified that the basis of classification was the "duties and responsibilities" of the position. In other words, ordinances bearing upon the various employments were not deemed controlling. Reynolds further testified:

> "There is no record or ordinance which even comes remotely close to specifying or defining or otherwise setting forth accurately duties of positions. I mean by that of any comprehensive specifications."

It should also be borne in mind that Reynolds' words were: "The classification was made of the positions", not of the employees.

It will be recalled that before the 1938 classification all clerical work in the revenue division of the water bureau was treated, for practical purposes, as a single classification. The 1938 classification, however, divided that work, as already indicated, into senior account clerks, account clerks and junior clerks. Reynolds explained the reason for this division:

> "Some of those employees have important responsibilities compared to others. Some of those employees have performed more difficult technical work. There are, I feel sure, some positions at what you might call a beginning or beginner's level * * *. There are other positions,—well, one I think of, that occupied by Mr. Simpson, which is essentially a supervisory position plus the keeping of some rather more difficult records * * *."

We shall now quote from the classification order. Its opening paragraph says:

> "At its meeting of January 12, 1938, the Civil Service Board directed that the classification plan of the city of Portland be revised on the basis of

information to be secured by means of a survey of the duties and responsibilities of the employees of the city. This survey has been completed for all positions, with certain exceptions  *  *  *."

The exceptions were some positions in the Police and Fire Bureaus. Omitting a paragraph, the order says:

"In considering the proposal attached, it should be remembered that the sole basis for allocating positions to classes has been the duties and responsibilities of the positions examined as revealed by questionnaires, conferences,  *  *  *  (A) The following classes of positions, identified by their respective titles are hereby established as of this date:

*Administrative, Fiscal and Clerical Service*
&ast;  &ast;  &ast;

Accounting and Bookkeeping Group
  Account clerk
  Senior account clerk
  Chief account clerk
  Accountant
  Chief accountant
&ast;  &ast;  &ast;

Miscellaneous Clerical Group
  Messenger
  Telephone operator
  Junior clerk
  &ast;  &ast;  &ast;"

We quoted from the order only the parts which set forth two divisions of the Administrative, Fiscal and Clerical Service groups. There are seven others. In addition to the Administrative, Fiscal and Clerical Service, the report listed six more main divisions. Each of these was subdivided into minor divisions, with the exception of the Fire and Police groups, which, as already indicated, were not fully classified by the attacked order. We observe that the order

throughout says that the classification is of positions —not of employees. The words just quoted are illustrative. After setting forth the classes of positions, the order continued:

"The positions occupied by employees permanently appointed in the classified civil service, except certain positions in the Police and Fire Bureaus and the Commission of Public Docks, not herein enumerated, are hereby allocated to the classes established in A hereof, as follows:

*Department of Public Works*

| Name | New Class Title | Old Title |
|---|---|---|
| Humphreys, Lester W. | Assistant to Commissioner of Public Safety | Assistant Commissioner of Public Safety" |

Mr. Reynolds, in explanation of the presence of the employees' name in the classification, testified:

"The individual employee was merely the means of identifying the position, that is, we would say, 'Well, the position occupied by Smith will be allocated to such and such a class and the position occupied by Jones will be allocated to such and such another class.' "

A better grasp of the classification will be gained by coming down to the very department with which we are concerned. We quote from that part of the classification:

"*Water Bureau—Revenue Division*

| Name | New Class Title | Old Title |
|---|---|---|
| Simpson, Harry B. | Senior Account Clerk | Clerk |
| * * * | | |
| Brown, Harry W. | Account Clerk | Clerk |
| * * * | | |
| Erickson, Selvena M. | Junior Clerk | Clerk" |

Simpson is one of the parties to this suit. Prior to October 26, 1938, the work which he performed was for practical purposes identified as Clerk, although its technical status was Class C, Rank D. The order under attack classified his work as Senior Account Clerk, and, in order to identify the exact position so classified, mentioned his name. The same explanation can be made concerning the work performed by Harry W. Brown. His position was formerly identified as Clerk, although its technical designation was the same as Simpson's; that is, Class C, Rank D. The order under review identified his position as Account Clerk. It will be observed that we also quoted from the order concerning the work performed by Selvena M. Erickson, who likewise is a party to this suit. Miss Erickson's position, prior to the 1938 order, was classified on the payrolls, budget-ordinances, and so forth, as Clerk, although its technical status was that of Class C, Rank D. The order under attack termed her position as Junior Clerk, but later, as we have indicated, the prefix "junior" was dropped and her position was called as previously, that is, as Clerk. Simpson's salary was $210 per month at the time of the trial. His duties were:

"Assistant to chief clerk; keeps control ledger; separates the billing for each ledger clerk, assigning the total billing reports to the ledger clerks."

Brown's salary was $175 per month. His duties were:

"Permit clerk; receives and records applications from plumbers; issues work orders to Construction Department for new services and construction work."

Miss Erickson's salary was $120 per month. Her duties were:

"Ledger work; posts credits; posts turn on and shut off orders; makes inspection entries on the

ledger sheets; records installation and removal of meters; balances monthly 14 trays containing approximately 15,000 accounts.''

The classification order, not only classified the positions, but also made provision for the existing eligible lists. One of its sections reads:

"Class titles of the existing eligible lists and the eligibles on such lists be changed to comply with titles set forth in A as follows:

| New Title | Old Title |
|---|---|
| Real Estate Director | Fiscal Agent, Delinquent Tax Bureau |
| Account Clerk | Clerk, Rank D |
| * * * | * * *''

It will be observed that the classification order does not contain a specification of duties. It is a mere grouping of jobs or positions. The specification, or definition, of duties of the various positions is maintained in the office of the Board in a separate file.

We shall later resume a consideration of the evidence, but shall now refer to some sections of the city's charter. Its pertinent sections are:

"No boards now existing * * * except * * * the Civil Service Commission which shall be called the Civil Service Board * * * shall continue to exist more than six months after this Charter takes effect * * *.'' (§ 17)

"The Council shall have and exercise all powers and authority conferred upon the City of Portland by this Charter or by general law, except where such power is herein expressly bestowed upon some other officer to the exclusion of the Council.'' (§ 18)

"The power and authority given to the Municipal Corporation of the City of Portland is hereby vested in a Council consisting of a Mayor and four commissioners, subject to * * *.'' (§ 20)

"The Council shall prescribe the powers and duties of officers and employees, * * * and may require an officer or employee to perform duties in two or more departments. * * *" (§ 57)

"The Council shall have the power by ordinance to create and abolish all such subordinate offices, places and employments in the service of the City as it may deem necessary for efficient and economical administration. Each commissioner shall appoint and remove the incumbents of all subordinate offices and employments in his department, subject to the Civil Service Rules of this Charter." (§ 82)

"A complete code providing for the administration of the powers and duties of the different departments and for their organization shall be enacted by the Commissioners as soon as possible after their election. * * * Provision shall be made for the transfer of employees from one department to another. * * * Each department shall keep time reports and cost data and efficiency records of its employees which shall be made the basis of promotions and increase of salary." (§ 58)

We come now to the charter provisions which pertain directly to the Civil Service Board. Section 97 says:

"All appointments to and promotions in the subordinate administrative service of the City shall be made solely according to fitness, which shall be ascertained by open competitive examination and merit and fidelity in service, as provided for in this Article. The provisions of this Article shall apply to the incumbents of all offices, places and employments in this public service of the City except the following * * *."

The exemption includes no one involved in this proceeding. Section 98 provides that the Civil Service

Board should consist of three commissioners. It further says:

"The Commissioners shall receive no salary or compensation for their services."

Section 100 reads:

"The Board shall classify, with reference to the examinations hereinafter provided for, all the offices, places and employments in the public service of the City to which the provisions of this Article are applicable. Such classification shall be based upon the respective functions of said offices, places and employments, and the compensation attached thereto, and shall be arranged so as to permit the grading of offices, places and employments of like character in groups and subdivisions. The offices, places and employments so classified shall constitute the classified Civil Service of the City; and after the taking effect of this Charter, no appointment or promotion to any office, place or position shall be made except in the manner provided for in this Article."

Section 101 directs the Board to write whatever rules and regulations may be necessary to fulfill the purpose of classified civil service.

Section 102 says:

"The Board shall, from time to time, hold public competitive examinations to ascertain the fitness of applicants for all offices, places and employments in the classified civil service."

The next section requires the Board to keep

"a register for each grade or class of positions in the classified civil service of the persons whose general average upon examination for such grade or class is not less than the minimum."

Section 106 provides:

"No person shall be appointed or employed under any title not appropriate to the duties to be performed, and no person shall, without examination, be transferred to or assigned to perform the duties of any position in the classified civil service unless he shall have been appointed to the position from which such transfer is made as the result of an open competitive examination equivalent to that required for the position to which the transfer is made, or unless he shall have served with fidelity for at least six years in a like position in the service of the city."

Section 113 imposes upon the Board the duty "to prepare, continue and keep in their office a complete roster" of all employees in the city's classified civil service. It requires that the roster "shall show in reference to each of said persons * * * the title of the place or office he holds, the nature of the duties thereof * * *." The section requires all officers and employees of the city to give the Board whatever information it may reasonably request as the basis for the compilation of the roster and affords the Board access to all public records which may aid in the compilation of a correct roster. Further, the section says:

"No officer or employee of the city shall draw, sign, countersign or issue any warrant or order for the payment of, or pay any salary or compensation to any person in the classified civil service who is not certified by the Board to the Auditor as having been appointed or employed in pursuance of this Article and of the regulations in force thereunder. * * * Any sums paid contrary to the provisions of this section may be recovered in an action in the name of the city from any officer or employee of the city paying the same * * *."

Section 114 empowers the Board to make whatever investigations in the city departments may be necessary to assure a compliance with classified civil service. It authorizes the members of the Board and its secretary to administer oaths in the course of investigations. The section allows the Board

> "to examine into books and records, compel the production of books, papers, records or documents, subpoena witnesses, and compel their attendance and examination, * * *."

It requires the officers and employees of the city to afford the Board "all reasonable facilities in conducting any investigation."

Section 108 governs tenure and removal from service. It says:

> "No employe in the classified civil service who shall have been permanently appointed under the provisions of this Article shall be removed or discharged except for cause, a written statement of which, in general terms, shall be served upon him and a duplicate filed with the Board. Such removal or discharge may be made without any trial or hearing. Any employe so removed may within ten days from his removal file with the Board a written demand for investigation. * * * The investigation shall be confined to the determination of the question of whether such removal or discharge was or was not for political or religious reasons, or was or was not made in good faith for the purpose of improving the public service. The burden of proof shall be upon the discharged employe. On such grounds the Board may find that the employe so removed is entitled to reinstatement * * *."

We did not quote in full the sections of which we have just taken note; we believe that we quoted the material parts.

The challenged classification order says:

"1. All permanent employes shall be allocated to the new classes without examination.  *   *   *

"2. Employes' seniority shall date from original appointment to the old class but shall be effective only in regard to the new class.  *   *   *

"(A) The following classes of positions identified by their respective titles, are hereby established as of this date:  *   *   *

"(B) The positions occupied by employes permanently appointed in the classified civil service, except certain positions in the Police and Fire Bureaus and the Commission of Public Docks not herein enumerated, are hereby allocated to the classes established in A hereof as follows:  *   *   *."

Then follow the lists of names accompanied by the old titles and the new ones to which we have already referred.

Section 3 of Rule 7 of the Rules and Regulations of the Board, published August 10, 1938, reads:

"The transfer of an employe from a position in one department to a position in the same class in another department may be made subject to the approval of the Board upon the written request of the employe approved by the appointing authorities concerned. A transfer from a position in one class to a position in a different class will not be permitted. Transfers of employes from one position to another within a department shall be reported to the Board in writing within twenty-four hours of the effective date of the transfer."

August 13, 1941, during the progress of the trial, the Board amended that rule so as to make it read:

"Transfers. The transfer of an employe from a position in one department to a position in the same class in another department may be made sub-

ject to the approval of the Board upon the written request of the employe approved by the appointing authorities concerned. 'Subject to the provisions of Section 106 of the Charter, a transfer from a position in one class to a position in a different class will not be permitted. Transfers of employes from one position to another within a department shall be reported to the Board in writing within twenty-four hours of the effective date of the transfer.' ''

The records of the Board indicate that at a meeting held November 19, 1941, the following action was taken:

"President Furuset offered the following amendment to Section 3 of Rule VII of the Rules and Regulations of the Board, stating that the purpose of amending this section was to make the Board's interpretation of Section 106 of the Charter clear and unmistakable in regard to transferring and assigning employees in the classified service:

"*Section 3. Transfers.* The transfer of an employe from a position in one department to a position in the same class in another department may be made subject to the approval of the Board upon written request of the employe approved by the appointing authorities concerned. *In Accordance with section 106 of the charter a transfer may be made from one position to another position in the same or a different department if the person to be transferred shall have been appointed to the position from which such transfer is made as the result of an open competitive examination equivalent to that required for the position to which the transfer is to be made, and such transfer shall be permitted whether the two positions be in the same class or in different classes, if the examination has been equivalent as above provided.* Transfers of employes from one position to another within a department shall be reported to the Board in writing within twenty-four hours of the effective date of the transfer.

"By unanimous vote the above amendment to Section 3 of Rule VII of the Rules and Regulations of the Board was adopted,  *   *   *."

The amendment just noted was adopted after the presentation of evidence in this suit had been concluded and the matter was pending for decision.

The records of the Board also indicate that November 3, 1941, (before the close of the trial) the Board adopted the following resolution:

"BE IT RESOLVED that this Board reiterates and repeats its construction of Section 106 of the Charter of the City of Portland, relative to the transfer of employes from one position to another in the classified civil service, which is as follows, to-wit: that any Commissioner may transfer a person employed in his department by the City of Portland, from one position to another in the classified civil service, or assign such person to the duties of another position if such person has taken the same examination or an open competitive examination equivalent to that required for the position to which the transfer is made; also if such person has served the city with fidelity for at least six years in a like position in the service of the City.  *   *   *

"BE IT RESOLVED that this Board repeats and reiterates its construction of the Charter relative to seniority rights of employes in the classified civil service which is and has been that the seniority of all employes in the classified civil service of the City of Portland dates from the date of the original appointment of any employe in the position occupied by such employe at the time of any lay-off or reduction in forces or abolishment of any office, place or employment and the laying off of employes or discharge by reason of the abolishment of any office shall be in the inverse order of their appointment in the department from which such lay-off occurs or where the office or place of employment has been

abolished; that when any employes on any laid-off list are re-employed they shall be reappointed to such office or employment in the order of their original appointment to such office or place of employment; and that if any offices or employments which have been abolished are again created, such employes shall have preference for re-employment in the order of their original appointment in such offices or places of employment in accordance with the provisions of Section 109 of the Charter of the City of Portland. * * *."

The amendments to the rules and the resolution were brought to the attention of the court by means of supplementary pleadings followed by evidence.

The amendment to Section 3, Rule 7, and the resolution adopted by the Board resulted from an inquiry made by the presiding judge during the course of the trial. Before the inquiry was made, Mr. Furuset, chairman of the Board, had testified that the classification and its accompanying rules did not prevent the employee parties to this case from being transferred from position to position in the Revenue Division in precisely the same manner as before the classification was made. After he had given that testimony, the presiding judge asked him:

"Mr. Furuset, will you and your Board draw a resolution as a matter of record and place it upon the record to that effect * * *?"

The words "to that effect" related to the words which Mr. Furuset had just spoken when he said:

"We did everything in the world we could to tell these few employees who objected that they never would be hurt in their seniority or in their right to a transfer."

The presiding judge's question was thus answered:

> "Why, I don't see why we shouldn't say it; * * * I certainly see no objection to adopting a resolution, which we have to anyway. There has never been any disposition to deny it."

It then developed that one of the civil service commissioners was absent from the city, and accordingly the Board was unable to take any action on that day.

Mr. John F. Logan, another of the three civil service commissioners, became a witness. Mr. Logan, who is a distinguished member of the bar, had served for thirty-one years as a member of the Board. He testified:

> "I want to say that I had a telephone message from the chairman about taking away any unfortunate interpretation. I want to say that I will meet any time if you won't object to two of us passing that resolution. As long as you won't object—I understand the third member of the Board is not in town. But I will meet tomorrow morning."

The presiding judge inquired:

> "In other words, your resolution would be such as would assure the appointing authorities and the parties in this case to the effect that their status had not been disturbed, their seniority has not been changed, and that in so far as the salary is concerned, you haven't anything to do with that?"

Mr. Logan replied in the affirmative. Still later the presiding judge remarked:

> "I think that if the Board will file in this court through the city attorney such a resolution, why, in so far as this case is concerned, I think we would probably wind it up."

As we have indicated, Section 3 of Rule 7 was amended and the above-quoted resolution was unanimously adopted by the Board before the cause was decided.

We shall now consider the appellants' contention that the challenged classification order did not affect the plaintiffs in any way except to identify with new names the positions which they held.

The answer filed by the defendants denied all averments of the complaint which alleged that the classification order prejudiced the plaintiffs, demoted some of them, interfered with the commissioner's right to transfer them from position to position, and that it will impair the seniority of the plaintiffs in the event an occasion arises in which seniority will be useful. Those denials are consistent with the position which the appellants have consistently maintained, that the purpose of the classification order, apart from identifying the existing positions with new names, was limited to future examinations.

■ It is evident from the provisions quoted in preceding paragraphs that the charter confers upon the Board no power to prejudice in any way the rights or status of any one in the classified civil service who does not himself violate any of the regulations which pertain to the service.

Although the Board is supreme in its own field, its field is a limited one. It can do nothing concerning existing employees except to (1) classify the jobs they hold; (2) prepare a roster containing their names and other pertinent data; (3) certify their names to the auditor for pay roll purposes; (4) write rules and regulations governing transfers from position to position in the classified civil service; (5) write rules and regulations governing promotions and discharges; (6) regulate promotions, subject to § 107 of the charter, and conduct promotional examinations; (7) make recommendations to the council for the betterment of the

classified civil service; (8) investigate the circumstances in the event a discharged employee alleges that his discharge was wrongful, or the Board suspects the discharge was unauthorized; (9) reinstate wrongfully discharged employees; and (10) conduct any other investigations that may be necessary.

The foregoing, and only the foregoing, is the authority which the Board possesses over existing classified civil service employees. It has no power to demote them, discharge them, alter their jobs, change their pay or in any other way prejudice their rights. All other powers which the Board possesses pertain to future employees and the manner in which the city may gain access to them; that is, by means of examination. That power is limited to (1) publishing rules and regulations concerning examinations and appointments; (2) conducting examinations; (3) maintaining a register which includes the names of all those successful in the examinations; (4) certifying to the appointing authority, upon receipt of notice of a vacancy, a list of eligible applicants; and (5) conducting investigations for the purpose of ascertaining whether or not the regulations pertaining to the classified civil service are being obeyed.

██ The above renders it clear that the Board possesses no power to accomplish any of the purposes which the plaintiffs attribute to the challenged classification order; that is, the Board can neither employ nor discharge anyone; it can neither create nor abolish any position; it can alter neither salaries nor seniority rights. Only the council can create a position, and only the commissioner in charge of the department where a vacancy exists can employ anyone. Likewise, only the commissioner in charge of the department where a

purportedly incompetent employee works can discharge him. Since all those permanently within the classified civil service can be removed only "for cause", as defined in § 108 of the charter, they have a tenure of office which continues until they afford cause for its termination; unless there arises one of the situations enumerated in § 109 of the charter (30-day suspension, abolishment of the job or reduction of the force). Removals, as we have indicated, are subject to the Board's inquisitional powers, and those wrongfully removed must be reinstated upon the Board's mandate.

Those charter provisions justify the observation that a civil service examination, followed by appointment into the service, fixes the employee's status. The examination is like an anchor—it secures the employee to his position and prevents him from being reduced to a lower position.

If there were no provisions in the charter regulating classified civil service other than those of which we have just taken notice, an employee could not be transferred without examination to a vacant position for which the examination is substantially the same as the one which he passed when he entered the service. If such were the case, a vacant position of substantially the same kind as one held by an existing employee, but paying possibly a larger salary, would have to be given to a stranger to the service whose name appeared upon an eligible list, even though the appointive authority preferred to transfer someone already in the service, who had passed an examination of substantially the same kind as the one which the Board gave to those upon the eligible list.

Section 106 of the charter makes provision for the transfer of an employee from one position to another.

It recognizes that the examination is the employee's anchor, but permits him to ride a little at anchor. It says that a classified civil service employee may be transferred to a position if he obtained his present one by an "examination equivalent to that required for the position to which the transfer is made" or if he has already "served with fidelity for at least six years in a like position in the service of the city." Thus, an appointing authority who is faced with a vacancy in his department need not introduce into the city's employ a new person by selecting someone from the Board's eligible list, provided he can find in the existing classified civil service a person who obtained his present position as the result of an "examination equivalent to that required for the position" which is now open, or one who has "served with fidelity for at least six years" in a position similar to the vacant one.

■ The appellants point out that since twenty-seven of the plaintiffs passed examinations for Clerk, Class C, Rank D, the twenty-seven are eligible under § 106 of the charter just analyzed for transfer to any of the work within the purview of Senior Account Clerk, Account Clerk and Junior Clerk. Those three classifications are merely subdivisions of the work previously known as Class C, Rank D. The other six plaintiffs, those whose status was that of Clerk, Class C, Rank C, are conceded by all to have the same rank as the other twenty-seven. Therefore, the respondents say that all of the thirty-three employee parties are qualified to perform the work of Senior Account Clerk, Account Clerk and Junior Clerk. We concur in this construction of the rights of the employee parties. We concur because the employee parties, prior to the attacked classification order, had taken examinations which entitled

them to perform all of the work now identified by the three new titles. Whether any one of them who is now performing work upon ledgers will be assigned to the cashier's cage or to work behind the counter, is, of course, dependent upon the volition of the appointive power. However, it is no more dependent now upon his volition than prior to the classification order. The appellants also concede that all of the employee parties to this suit have served faithfully for six years "in a like position" to Senior Account Clerk, Account Clerk and Junior Clerk. Therefore, the other clause of § 106 likewise entitles them to be transferred from position to position in the Revenue Division to the same extent as before the classification order was pronounced.

The plaintiffs, however, point to § 3 of Rule 7 of the rules and regulations of the Board as published August 10, 1938, and argue that it prevents the transfers authorized by § 106 of the charter. The sentence of § 3 upon which they rely reads:

"A transfer from a position in one class to a position in a different class will not be permitted."

Manifestly, the purpose of that prohibition was the prevention of promotions made in violation of the provisions of the charter which regulate their manner. The basis of the rule was sound: Field, Civil Service Law, pp. 141-145. It is evident from the testimony given by the witnesses whom we previously mentioned that the Board did not intend by Section 3 of Rule 7 to interfere with the transfer of the employee parties to this suit to the different clerical positions in the Revenue Division. They interpreted their rule as applicable only to future employees. When they discovered that its language was misunderstood, they amended the rule; and when

it developed that the amended rule did not express their meaning as clearly as they could, they resorted to a second amendment. Both amendments are set forth in preceding paragraphs. The rule in its amended form, we believe, is not only in harmony with § 106 of the charter, but renders it clear that an employee, whether a party to this suit or not, can be transferred to another position, regardless of class or department, if the examination which he took when he entered the city's employ was equivalent to that for the position to which he desires transfer.

It is so obvious from the foregoing that the Board possesses no authority to classify persons or employees, and no authority to prejudice the rights of any existing employee in the classified civil service that it would be remarkable if the defendant Board, which is composed of able men of extensive experience, intended by the attacked order to accomplish the purpose mentioned in the complaint.

It is evident from the testimony given by the two members of the Board who testified that they not only fully knew that the Board possesses no power to alter the rights of any existing classified civil service employee, but also that they had no intention whatever of altering the rights of any employee. The same statement is warranted concerning the testimony of the Board's secretary and of its examiner. Mr. Furuset testified:

"This classification or reclassification, or whatever you want to call it, did not prevent, and the Board had no idea of preventing, a transfer from one position to another where the employee had taken the same or an equivalent examination and every administrator in the city of Portland has that authority now and he had it before."

Further he testified:

> "In order to eliminate any misconstruction of those rules, we amended Rule, I think it is 7, by Paragraph 3, so there could be no misconstruction of that, and it has always been our idea and the charter plainly says that an administrator has that right, where an employee has taken the same examination or an equivalent examination, all that the employer has to do or the appointing authority is to make a report to the Board within 24 hours. Then if we find that the employee did not take the same examination or an equivalent examination, of course, the transfer could not be made."

When Mr. Reynolds was upon the witness stand, the presiding judge asked him:

> "Do you contend that this classification reflects or in any way circumscribes or modifies the existing jobs as such, that is, the duties of jobs as such?"

The answer was:

> "Absolutely not."

Shortly he was asked:

> "As I understood your testimony this morning, it was that an employee in the Water Bureau, having been duly qualified by virtue of an examination under "D", under Rank "D" graded Rank "D", could be by the appointing authority assigned to either of these titles, either Clerk, Account Clerk, or Senior Clerk?"

Reynolds answered:

> "That is my understanding."

When Mr. Marion was upon the stand, the presiding judge asked him:

> "As I get it, it was the general theory that those employees who had taken that examination or who

had had efficient service for six years, would not in any way be influenced by this new titling or new classification in regard to taking examinations or otherwise?"

Mr. Marion answered:

"I don't think there is any question of that, Your Honor, because if Section 106 means anything, it means that the Board would be powerless to deprive them of that right."

Later, the presiding judge asked Mr. Marion:

"Well, then, now getting back to the specific instance of the Water Bureau, if an employee of the Water Bureau had taken the examination of Rank D or had been in the service six years efficiently, he wouldn't have to taken an examination for a transfer to any of these different titles, as I understand it; he wouldn't be required to do so."

The following is the answer:

"That is to say, a person who had taken an examination for Clerk, Rank D, would not be required to take an examination for Clerk, Account Clerk or Senior Clerk."

The presiding judge then made the observation, "That is right." And Mr. Marion concluded the matter by saying, "That is my understanding of it, yes."

The presiding judge propounded to Mr. Logan a question which reviewed at some length the situation placed before the court by this suit, and then asked him.

"When they (the Board) make that (the classification) do they in any way or is it the intention in any way of the Board to interfere with the situation as it existed prior to October 26, 1938, as to the operation and the mechanism adopted by the superintendent, as I have outlined it to you?"

Mr. Logan answered:

" The answer is no."

Next he was asked:

"Is it the intention of the Board at any time and the intention in the creation of this action on October 26, '38—is it the intention of the Board and is it so construed by the Board that this in any way directly or indirectly interferes with seniority rights of any of the employees in this department?"

The answer follows:

"No, sir, no, Judge."

As long ago as 1915 the city's attorney, in a written opinion, placed upon the sections of the charter previously mentioned the same interpretation as the quoted testimony and our analysis indicates. For instance, June 28, 1915, the late W. P. LaRoche, who was then city attorney, advised the Board:

"If the council creates an office and calls it "municipal engineer", or any other name, it is the duty of the Civil Service Board * * * to classify that office * * * and hold examinations for eligibility to such office. * * * If there are men on the eligible list who have passed a competitive examination equivalent to that which the Board finds to be required for the new position, I am of the opinion that it would not be necessary to hold a new examination, but that a certification for appointment could be made from such list."

November 8, 1917, Mr. LaRoche, in a written opinion to the Board, said:

"If there is no person in the employ of the city who has taken an examination equivalent to that required for that position and no person who has served six years in a like position, then there is no person in the employ of the city eligible to transfer thereto or to assignment to work in such position, * * *."

·. The brief filed by the appellants in ·this· court repeatedly states that the ·attacked classification had no application to any one in the city's employ October 26, 1938, except to change upon the Board's records the titles of the positions which the existing employees held. For instance, their brief says:

"·Thus, it is at once apparent that the charter did not and does not contemplate that the Board may so classify as to affect the status, rights or privileges of existing employees, who have previously been classified, taken an examination under such classification and received appointment. Therefore, the classification complained of does not affect the plaintiffs. * * * The new titles change not one whit the rights, privileges and status of existing employees * * *. The classification here under consideration is not a reclassification. It is not classifying the same classes, groups or positions and services over again. It was distinctly a new classification. It was for new examinations. It had no reference to old examinations or to employees who had taken examinations and were then in the service. * * * The plaintiffs claim that the new classification, which they call a reclassification, should not affect their rights, privileges and status. The defendants, on the other hand, do not question or contest this assertion, and they too say that the Board should not, could not and did not by the new classification change or impair the rights, privileges and status of the plaintiffs. There is, therefore, no controversy, concerning any right, privilege or status of the plaintiffs."

We are satisfied that the Board, in adopting the attacked classification, had no intention of lessening the rights of any employee of the city, and that the charter confers upon the Board no power to interfere with the rights of any employee in the classified civil service who conducts himself in obedience to its regula-

tions. We have studied the attacked classification carefully, but fail to find in it any provision which supports the plaintiffs' contention that the classification renders less secure the rights of those who were in the city's employ October 26, 1938. The classification order, in fact, is not concerned with the rights or status of anyone who was in the city's employ at the time of its entry except to change the name of the job or position that he held. It is not a classification of employees, but of jobs or positions. That fact was recognized by one of the original plaintiffs in a letter which he wrote to the Board March 4, 1939, (before this suit was filed) in which he said: ''It appears to me that you are classifying the positions instead of the employees.'' He was right.

■ The fact that the attacked classification order set opposite the titles of the positions held by the employees their names does not show that it was a classification of employees. The sole purpose of the arrangement was to identify the positions which were being classified. It would have been unworkable to have continued to call the positions held by those in the city's employ October 26, 1938, by the old names, for instance, Clerk, Class C, Rank D, when like positions held by those entering after that date would be identified by the new names, for instance, Account Clerk.

We are satisfied that the challenged classification was intended to serve only the purpose of future examinations and recruitments. All persons in the city's employ October 26, 1938, retain the rights that they then possessed. Those rights have not been impaired.

■ Clearly, the challenged order was not intended to lessen the seniority of anyone who was in the city's

employ October 26, 1938. The provision of the order which says: "Employee's seniority shall date from original appointment to the old class but shall be effective only in regard to the new class" was inaptly worded. Seemingly, it undertook to preserve the seniority of everyone who was in the city's employ October 26, 1938, and to recognize their seniority as being prior to that of those who entered the city's employ after that day as members of the newly entitled classes of Senior Account Clerk, Account Clerk, Junior Clerk. But, when it developed at the trial that the clause did not aptly express that meaning, the Board adopted the resolution concerning seniority which is quoted in a preceding paragraph. It is in harmony with the charter and is not criticized by the plaintiffs.

■■ Whether the seniority of any party to this suit will yield something depends upon future events, the nature of which no one can predict. Seniority rights are not exercised every day. Very likely many persons, after spending a decade in the city's service, retire therefrom without having had occasion to exercise their seniority rights. Portland's growth and the expansion of its water service render it unlikely that the clerical service in the Revenue Division will be curtailed, thus affording occasion to anyone to insist upon his seniority rights. It is apparent that the plaintiffs have no present rights afforded them by seniority which they may exercise; their seniority rights are conditional or inchoate. The courts have many times held that a declaration will not be pronounced in suits where the rights of the plaintiff are contingent upon the happening of some event which can not be predicted and which may never occur. Hence, the plaintiffs' seniority affords no occasion for pronouncing a declaration of their

rights: Borchard, Declaratory Judgments, 2d ed., p. 423, and 16 Am. Jur., Declaratory Judgments, p. 292, §§ 18 and 19.

We bestowed unusual attention upon this case because some employees of the city whose services have been long and faithful felt that their rights were prejudiced by the challenged classification order. They have the assurances of the appellants, many times repeated, that no impairment of their rights was intended. Our careful analysis of the record convinces us that there is no basis for any misgivings on the part of the plaintiffs. The challenged order does not interfere with any of their rights, nor does it lower the status of any one of them.

By reason of the conclusion just stated, the plaintiffs are entitled to a declaration stating that the attacked order has no effect upon them except to change the titles of the positions which they hold. We shall, however, take note of other matters.

We observe that the able circuit court judge, from whose decree this appeal was taken, said in a memorandum opinion:

"The Court, therefore, is of the opinion that * * * the order of October 26, 1938, growing out of the extended survey and submitted to the council invades the powers of the city council and that the Civil Service Board preparatory to the adoption of said order should have secured by ordinance a prescription by the council of the functions and duties and employments which would form the basis upon which the Board could lawfully carry on its work of classification."

Lest the fact that we bestowed extensive attention upon this suit might cause an inference to be entertained that we doubt the validity of the challenged

order, we state that we have no doubts upon that subject. The Board and the council are two separate bodies which have independent jurisdiction springing from the same source. The source of the one is no higher than that of the other. It is our belief that it is the duty of the Board to classify every position in the city administration mentioned in § 97 of the charter, whether the council defined the duties of the position or not. A neglect by the council does not relieve the Board of its duty, nor does it take that position out of the scope of classified civil service. The words of § 100 of the charter are unconditional. They are: "The Board shall classify." The positions, of course, must somehow be created by the council. If it were true that the Board can not classify unless the council in formal manner has prescribed the duties of the office, and if it were also true that the duties of the clerical positions held by the plaintiffs were never defined by the council, then the Board never possessed power to conduct civil service examinations for those positions. In that event, the plaintiffs are not lawfully entitled to the positions they hold.

Section 57 of the charter, which imposes the duty upon the council to "prescribe the powers and duties of officers and employees," was not adopted until 1913. Until that time there was no such provision in the charter. The clerkships in the Water Bureau, however, had been created long before 1913. At the time of their creation no ordinance specified their duties—they were defined largely by daily practice, long continued, and by the repeated use of the word Clerk in ordinances which pertained to those positions. The staff in the water works was taken over by the city in 1895 or so, when it acquired the plant from the private concern which up to that time owned and operated it. When

classified civil service was inaugurated in 1903 the staff of clerks in the water office was accepted automatically into the classified civil service and their positions, as well as their names, were entered upon the roster of the civil service commission. However, no ordinance was enacted which defined their duties. In 1905 a reclassification was made which embraced those clerkships. At that time the title of their jobs was altered, but the change was unaccompanied by any ordinance specifying the duties of those jobs. Then in 1913 came the present charter, including § 57. In the same year the council enacted an ordinance which the plaintiffs term an administrative code. They contend that it and an ancillary one prescribe the duties of the clerks in the water office. Simultaneously with the enactment of the so-called administrative code, the Board wrote the reclassification of 1913 which we have already mentioned. The plaintiffs claim that the aforementioned administrative code renders valid the 1913 reclassification and that the code was enacted in compliance with § 57 of the charter. If the so-called administrative code supports the contentions of the plaintiffs and sustains the 1913 reclassification, then it also sustains the 1938 classification; that is, the one now under review. The so-called administrative code and all other ordinances above mentioned have never been repealed, although the purported administrative code has fallen into disuse. Upon the other hand, if the council has not prescribed by ordinance the duties of the clerks in the Water Bureau, Revenue Division, it nevertheless remains true that it was the duty of the Board to classify those positions. In the classification of those positions the Board had the right to pursue the course which it took; that is, to gain information concerning the work which the clerks were actually performing, through

the exercise of its inquisitorial powers. We explain that the council has seemingly construed § 57 to mean that it shall prescribe the duties of officers and employees whose positions it creates; that is, those created after the commission form of government went into effect. So far as the record indicates, it has prescribed the duties of all new offices.

The plaintiffs argue that the defendant Board has no power "to reclassify." As we said in a preceding paragraph, nothing of consequence turns upon the issue as to whether or not the challenged order was one of classification or reclassification. The Board's duty to keep itself informed concerning the duties of every job and position created by the council is a continuous one. Whether this duty is one of classifying or of reclassifying is immaterial. The duty must be performed, and the charter charges the Board with the burden of performing it. The imposition of the duty bestows, by implication, the power. See annotation appearing in 134 A. L. R. 1103, especially at 1118.

■ ■ The plaintiffs presented the testimony of some officials of the Water Bureau which indicates that the 1938 classification may confront those officials with some difficulties. "Over-classified" and "you can have too many classifications" are phrases taken from their testimony. The Board wrote the classification in the exercise of the power which § 100 of the charter confers upon it. "The Board shall classify * * *" are the words of that section. Classification, when performed by a Civil Service Board, is the exercise of a ministerial or executive power. The exercise of the power is subject to review when the circumstances show that the Board exceeded the authority conferred upon it, that it abused the power it possessed, or that its results

were palpably wrong. The testimony of the witnesses just mentioned affords no occasion to set aside the classification.

It follows from the above that the circuit court erred when it held void the classification order entered by the Board October 26, 1938. That order is valid. The plaintiffs are entitled to a declaratory decree which construes the 1938 classification. The decree ought to state that the 1938 classification has neither demoted nor promoted any party to this suit; that it does not prejudice any of the plaintiffs; that it has not lessened the right of any appointing official to transfer from position to position the employee parties to this suit to the same extent as before the entry of the attacked classification; and that the seniority rights of all employees in the classified civil service are as set forth in §§ 107 and 109 of the city's charter.

If the parties so choose, this opinion may serve as their declaratory decree; but if they prefer one to be entered in the circuit court's records, then that court may enter the proper decree; it is to be governed, however, by this opinion.

This suit is remanded to the circuit court for the purpose of the entry of the proper decree. Costs and disbursements shall be allowed to no party to this proceeding.